COOLEY LLP
HEIDI L. KEEFE (178960) (hkeefe@cooley.com)
MARK R. WEINSTEIN (193043) (mweinstein@cooley.com)
RONALD S. LEMIEUX (120822) (rlemieux@cooley.com)
KYLE D. CHEN (239501) (kyle.chen@cooley.com)
Five Palo Alto Square, 4th Floor
3000 El Camino Real
Palo Alto, California 94306-2155
Telephone:   (650) 843-5000
Facsimile:    (650) 857-0663

STEPHEN R. SMITH (*pro hac vice*) (stephen.smith@cooley.com)
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
Telephone:  (703) 456-8000
Facsimile:  (703) 456-8100

Attorneys for Plaintiffs
HTC CORPORATION and HTC AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HTC CORPORATION and HTC AMERICA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>TECHNOLOGY PROPERTIES LIMITED, PATRIOT SCIENTIFIC CORPORATION and ALLIACENSE LIMITED,<br><br>Defendants. | Case No. 5:08-cv-00882 PSG<br><br>[Related to Case No. 5:08-cv-00877 PSG]<br><br>**MOTION FOR JUDGMENT AS A MATTER OF LAW OF NON-INFRINGEMENT [PER F.R.C.P. 50(A)]**<br><br>Complaint Filed:    February 8, 2008<br>Trial Date:            September 23, 2013<br><br>Date:    September 23, 2013<br>Time:   9:00 a.m.<br>Place:   Courtroom 5, 4th Floor<br>Judge:  Hon. Paul S. Grewal |

Case No. 5:08-cv-00882 PSG                         **MOTION FOR JUDGMENT AS A MATTER OF LAW OF NON-INFRINGEMENT**

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that Plaintiffs HTC Corporation and HTC America, Inc. (collectively "HTC"), before this case is submitted to the jury, move pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on the grounds that defendants Technology Properties Limited, Patriot Scientific Corporation and Alliacense Limited (collectively "TPL") have failed to present a legally sufficient evidentiary basis to find for TPL on any issue over which it bears the burden of proof. More specifically, HTC seeks judgment as a matter of law on the ground that: (1) HTC does not infringe any one of claims 6, 7, 9, 13, 14 or 15 of U.S. Patent No. 5,809,336 ("'336 patent"); (2) TPL has not shown that any alleged infringement by HTC was willful; and (3) TPL has not provided legally sufficient evidence to sustain a claim of damages for any alleged infringement. This Motion is based on the Memorandum of Points and Authorities set forth below, the evidence and proceedings at trial, and such other matters as may be presented at the hearing on Plaintiffs' motion and allowed by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

TPL failed to present any evidence at trial as to at least two elements of each asserted claim of the '336 patent. First, independent claims 6 and 13 require "*an entire oscillator* disposed upon said integrated circuit substrate and connected to said central processing unit." The Court has held that the term "entire oscillator" is "properly understood to exclude any external clock used to generate the signal used to clock the CPU." (Dkt. No. 616, at 2:6-7.) Second, each asserted claim includes the requirement of "varying the processing frequency of said first plurality of electronic devices and the clock rate of said second plurality of electronic devices in the same way as a function of parameter variation in one or more fabrication or operational parameters associated with said integrated circuit substrate." Because TPL failed to present sufficient evidence upon which a reasonable jury could find for TPL on either of these limitations, judgment as a matter of law of no infringement should be entered. TPL also failed to present any evidence that any alleged infringement by HTC was willful, and the evidence at trial negates both the objective and subjective prongs of the willful infringement test. Finally, TPL

has failed to present legally sufficient evidence to support its claim of a reasonable royalty from HTC.

## I.  LEGAL STANDARD

"A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." FED. R. CIV. P. 50(a)(2). A court may grant judgment as a matter of law against an adverse party if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1).

## II.  TPL HAS FAILED TO SHOW INFRINGEMENT BY HTC

TPL has confirmed that its infringement claim against HTC is based entirely on *literal* infringement. (09/27/2013 Trial Tr. at 1012:25-1013:3.) Literal infringement is established only if TPL establishes that "every limitation recited in the claim appears in the accused device, *i.e.*, when the properly construed claim reads on the accused device exactly." *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001) (internal quotations and citation omitted). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Judgment as a matter of law of no literal infringement should be entered because TPL's evidence failed to establish at least two elements recited in each independent claim of the '336 patent.

The Federal Circuit has made clear that the question of literal infringement is properly decided as a matter of law when, as here, there is no material dispute regarding the operation of the accused products. *See, e.g.*, *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007) ("Because there is no dispute regarding the operation of the accused systems, that issue [of literal infringement] reduces to a question of claim interpretation and is amenable to summary judgment."); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999) ("Because the relevant aspects of the accused device's structure and operation are undisputed in this case, the question of whether [the accused product] literally infringes the asserted claims of the [patent-in-suit] turns on the interpretation of those claims."); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("And the standard for granting summary judgment 'mirrors' the

standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986))).

### A. Defendants failed to show a clock or oscillator that generates a signal to clock a CPU without the use of an external clock

The Court has held that the term "entire oscillator" is "properly understood to *exclude any external clock used to generate the signal used to clock the CPU*." (Dkt. No. 616, at 2:6-7.) The testimony of TPL's technical expert, Dr. Vojin Oklobdzija, confirmed that the accused HTC products include precisely what the Court found to be excluded by the claims – an "external clock used to generate the signal used to clock the CPU." Dr. Oklobdzija's testimony was also consistent with the testimony of every other technical witness who testified at trial.

As Dr. Oklobdzija acknowledged, although each accused HTC product includes Qualcomm, Texas Instruments (TI) or Samsung chips, for purposes of his infringement analysis, "they generally work the same way." (09/26/2013 Tr. at 734:16-18.) In particular, each of these chips includes a Phase Locked Loop (PLL) that receives an input from an external (off-chip) reference signal which is based on a crystal. (*Id.* at 734:19-22, 735:6-19, 744:15-745:3.) This external reference signal is, according to Dr. Oklobdzija, "essential" to the PLLs in all of the accused HTC products. (*Id.* at 737:17-738:2.) The external reference produces a "stable" signal that "is used to adjust the frequency generated by the ring oscillator, so it has some relationship with it." (*Id.* at 738:9-17.) The purpose of the PLL, in fact, is to adjust the frequency of the on-chip oscillator based on that reference. (*Id.* at 746:11-18.) The evidence at trial established that the Qualcomm, TI and Samsung chips at issue in this case all use such a PLL with an external reference signal. (*See, e.g.*, Trial Exs. Ex. 3084 at HTCTP0075742 (TXCO), Ex. 3107 at QCHTCTPL0013601 (Fig. 12-1, TXCO), QCHTCTPL0013600, Ex. 3109 at QCHTCTPL0017373, Ex. 3112 at QCHTCTPL0024020, Ex. 3091 at HTCTPI0002154 (CLK_REF), Ex. 3115 at TI-0001073 (CK_REF), Ex. 3100 at PIC00004245-46.)

Dr. Oklobdzija also acknowledged that the relationship between the frequency of the on-chip oscillator and the external clock is defined by a formula contained "in every textbook" that defines the relationship between the frequency of the reference signal and the output frequency of

the oscillator. (*Id.* at 739:12-24, 749:4-6.) The Qualcomm, TI and Samsung chips all use such a formula to define the frequency of the external clock. The notation use to express the formula may differ from chip-to-chip, but in each case, the formula expressly uses the external clock frequency. (*See, e.g.*, Trial Exs. Ex. 3101 at QCHTCTPL0007812 (MSM7201), Ex. 3112 at QCHTCTPL0024021, Ex. 3115 at TI-0001076, Ex. 3117 at TI-0007192.) One example of a formula that was presented at trial in detail was the following formula that was used during Dr. Oklobdzija's testimony:

### 5.1 Output Frequencies

The PLL output clock frequency is given by:

$$f_{CLK} = f_{TCXO} * L * 2$$

(Trial Ex. 3027.0030.)

The formula shown above states that the output frequency of the on-chip clock ($f_{CLK}$) equals the <u>frequency of the external crystal clock</u> ($f_{TCXO}$), multiplied by "L," multiplied by 2. (09/26/2013 Tr. at 743:5-20.) The table below, from the same page of Exhibit 3027, shows the output signal frequency generated based on the external reference frequency (19.2 MHz) multiplied by "L" and 2. For example, for an "L" value of 10, the output of the on-chip clock will equal 19.2 MHz * 2 * 10, which equals 384 MHz. (*Id.* at 743:21-744:17, 748:22-749:6.)

Table 5-1 PLL output clock frequencies with 19.2 MHz reference

| Input frequency | L | PLL_L_VAL[5:0] | Output frequency ( MHz) |
|---|---|---|---|
| 19.2 MHz | 10 | 001010 | 384.0 |
| 19.2 MHz | 11 | 001011 | 422.4 |
| 19.2 MHz | 12 | 001100 | 460.8 |
| 19.2 MHz | 13 | 001101 | 499.2 |
| 19.2 MHz | 14 | 001110 | 537.6 |

(Trial Ex. 3027.0030.) Dr. Oklobdzija admitted that a manufacturer can select the "L" value depending on what it wanted to achieve in its product. (09/26/2013 Tr. at 746:8-18.)

As this example illustrates, the external clock in the accused HTC products is clearly used to generate the signal that clocks the CPU. This is because the external clock (represented for example by the input frequency or TCXO above) exerts direct control on the frequency of the on-chip oscillator (represented by the output frequency $f_{clk}$) in accordance with a fixed formula. The fact that the external clock is "used to generate the signal that clocks the CPU" is apparent from the fact that the output frequency of the on-chip clock is expressly calculated, in each instance, based on the input frequency provided by the external clock. And there is no dispute that all of the PLLs in all of the HTC accused products use a formula similar to the one above, and therefore, generates the clock signal as a function of the frequency of the external clock. This was confirmed through the trial testimony of Sina Dina, Baher Haroun and Thomas Gafford. (*E.g.*, Trial Tr. at 350:7-17, 359:364:22-363:24, 365:17-366:1, 1046:9-14.) The evidence also makes clear that neither the PLLs nor the HTC phones themselves can function properly without the external crystal clock.

TPL's argument at trial appears to be based on a reading the Court's claim construction order as excluding only an external clock that directly generates the signal that clocks the CPU. The Court's actual holding was not so narrow. The Court found that the "entire oscillator" excludes "any external clock ***used to*** generate the signal used ***to clock the CPU***." The Court's construction makes clear that if an on-chip "entire oscillator" uses any external clock to generate that signal, it does not meet the claim limitation. The external clock in the present case is indisputably <u>used</u> to generate the signal used <u>to clock the CPU</u> because, among other reasons, it is essential to generating that clocking signal.

**B.    TPL Failed to Show that the Processing Frequency of the CPU and the "Entire Oscillator" Vary In the Manner Required by the Claims**

TPL also failed to show the element of "varying the processing frequency of said first plurality of electronic devices [for the CPU] and the clock rate of said second plurality of electronic devices [for the "entire oscillator"] in the same way as a function of parameter variation in one or more fabrication or operational parameters associated with said integrated circuit substrate." The evidence at trial established that the accused HTC products use fixed

speed clocks that do not vary based on fabrication or operational parameters. As Mr. Dina testified, for example, "regarding PLL's, I can tell you that PLL's are designed to maintain the target frequency across PVT variations." (Trial Tr. at 1062:2-3, 359:2-8 (Haroun).) Using a fixed speed clock to clock the CPU was important to enable the HTC phones to operate consistently across all conditions. (09/27/2013 Trial Tr. at 1031:9-1032:9.) The processing frequency of the CPU and the on-chip clock varies as a function of the formulae discussed above, which establish the output signal frequency based on the external reference signal and other factors relating to the PLL circuitry. None of the formulae for any of the Qualcomm, TI or Samsung chips recites process, temperature or voltage as playing any role in the determination of the output frequency of the on-chip clock. The testimony from Mr. Gafford also showed through empirical testing that the frequency of the on-chip clock moved up or down based on changes in the frequency of the external crystal clock – not based on variation across operational parameters such as temperature.

### III. TPL HAS FAILED TO SHOW WILLFUL INFRINGEMENT BY HTC

A showing of willful infringement requires TPL to establish by clear and convincing evidence (1) that the accused infringer "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and (2) that this objectively defined risk "was either known or so obvious that it should have been known to the accused infringer." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). TPL did not establish either the objective or subjective prong at trial.

Under the objective prong of the willful infringement analysis, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id*. "The state of mind of the accused infringer is not relevant to this objective inquiry." *Id*. This objective determination entails an assessment of the reasonableness of the accused infringer's defenses, such as its arguments about non-infringement. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1006 (Fed. Cir. 2012). This objective prong presents a legal question for decision by the judge. "When a defense or noninfringement theory asserted by an infringer is purely legal (e.g.,

claim construction), the objective recklessness of such a theory is a purely legal question to be determined by the judge." *Id*. at 1007. Even when the objective prong turns on factual issues, which is does not here, "the judge remains the final arbiter of whether the defense was reasonable, even when the underlying fact question is sent to a jury." *Id*.

The evidence at trial established that HTC's non-infringement defenses are, at a minimum, objectively reasonable. With respect to the "entire oscillator" limitations, it is undisputed that all of the HTC products rely on a PLL that uses an external clock to generate the signal used to clock the CPU. TPL has presented no evidence that HTC's defenses are not, at a minimum, objectively reasonable. The objective reasonableness of HTC's position is further confirmed by the fact that the named inventors of the '336 patent – Mr. Moore and Mr. Fish – both shared HTC's view regarding the scope of the alleged invention as not covering fixed speed clocks that rely on external PLLs. (*See, e.g.*, 09/24/2013 Trial Tr. at 312:7-17, 313:23:314:4, 315:12-17.) HTC has consistently relied on these reasonable non-infringement defenses. (*See, e.g.*, Trial. Ex. 1118, at TPL853_02185142; Ex. 1282 at TPL853_02185820 ("However, without the reference signal from the external crystal, the ring oscillator variable speed system clock would not be generated by the ring oscillator.").) TPL therefore cannot establish willful infringement as a matter of law.

## IV. TPL HAS FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE OF DAMAGES

TPL claims that HTC is liable for $9,486,266.00 in damages for alleged infringement. TPL's evidence and testimony offered at trial cannot support this claim.

TPL based its damages opinion on the entire revenue generated by the accused phones, which are complete, multi-component mobile handsets. Federal Circuit law makes clear that the entire market value rule is a "narrow exception" to the general rule that royalties cannot be based on the revenue of the entire product, but on the "smallest salable patent-practicing unit." *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). This "narrow exception" applies only if the patentee can show that the patented feature drives the demand for the entire accused product. *Id.* "To employ the entire market value rule," in other words, "plaintiffs first must show that the infringing feature is the primary reason that consumers buy the

product; the necessity of the infringing feature to the product is insufficient." *Brocade Communications Systems, Inc. v. A10 Networks, Inc.*, No. 10- cv-3428 PSG, 2013 WL 831528, at *14 (N.D. Cal. Jan. 10, 2013) (Grewal, J.). TPL did not make any attempt to show that the entire market value rule applies here. The jury heard no evidence to show that the allegedly infringing features drive demand for the accused products. Dr. Prowse simply stated that he "determined" that the royalty base of the hypothetical license is the sales of all accused HTC products after he "looked at the data" in the case. (Trial Tr. 847:16-19.) TPL's request for a "lump-sum" royalty payment does not provide an exception to the entire market value rule.

Dr. Prowse's testimony also failed to meet the Federal Circuit's requirement of using licenses that are comparable to the hypothetical license at issue. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1325 (Fed. Cir. 2011). Further, the comparability analysis requires that the patentee "account for differences in the technologies and economic circumstances of the contracting parties." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2011); *see also Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443 (Fed. Cir. 1990) (reversing damages award where the district court permitted the patentee's expert to rely solely on a prior license agreement that included a license to the patent in suit, but "conveyed rights more broad in scope than those covered by Trell's patent."). Dr. Prowse's analysis fails because the vast majority of licenses on which he relies are non-comparable.

Mr. Leckrone testified at trial that the most relevant licenses in calculating patent damages were the ones in the same industry segment as HTC. (Trial Tr. 405:3-9.). Dr. Prowse, however, despite relying on his interviews with Mr. Leckrone (9/26/13 Tr. at 858:16-22), chose to give the most relevant licenses in HTC's industry segment – Mobile Communications – the *least* weight. Even more egregious is the fact that he didn't give *any* weight to perhaps the most relevant license – the Apple license. (*Id*. at 872:9-14 ("Apple is not here. I did not consider Apple...."))

Instead, Dr. Prowse relied on over 100 licenses that were non-comparable to the hypothetical license at issue in this case. These licenses were non-comparable in that they: (1) granted patent rights far broader in scope than the hypothetical license at issue in this case, and (2) the licensees were not sufficiently similar to HTC.

1       First, the vast majority of those licenses granted patent rights far broader in scope than the
2  rights to the '336 patent. These licenses were for the entire MMP portfolio, which includes at
3  least seven U.S. patents, and several foreign patents and applications. (Trial Tr. 1142:5-6.) Here,
4  however, the hypothetical license would grant HTC rights to only one patent within the portfolio.
5  Again, TPL presented no evidence of the value of the '336 patent in relation to the other assets in
6  the MMP portfolio.

7       Second, the licensees were not similar to HTC. Dr. Prowse grouped into "buckets"
8  several licenses based on one factor that the licensees had in common with HTC, in isolation. Yet
9  he did not account for any differences between HTC and the licensees. For example, in one
10 bucket, Dr. Prowse considered companies whose only similarity with HTC was that they agreed
11 to licenses purportedly around the time of the hypothetical negotiation date. (932:5-12.) Dr.
12 Prowse did not explain to the jury what time period constituted a "similar time." Indeed, he
13 included licenses dated over 16 months after the hypothetical negotiation date. (943:6-18.) He
14 could not explain to the jury why he chose not to include only licenses entered into within a year
15 of that date, when including only those licenses would have reduced the effective rates in that
16 bucket by half. (*Id*.)

17       Dr. Prowse also grouped a separate set of licenses with companies whose only similarity
18 with HTC was their revenue size. (881:2-7; 933:18-934:2; 943:19-25.) Dr. Prowse included in
19 this bucket companies that make trucks and auto parts, along with a photography equipment
20 company. (944:15-13-17.) When asked about these companies, Dr. Prowse agreed that "none of
21 them are companies that compete with HTC and none of them make smartphones." (944:22-24.)
22 Even within the mobile communications bucket, Dr. Prowse skewed the royalty rates upward by
23 including Sierra Wireless, a company that does not make smartphones. (945:23-947:9.)

24       Perhaps most tellingly, Dr. Prowse could not show the jury that he had even a mere
25 surface-level understanding of the licensees that he used to compare with HTC. (Trial Tr. at
26 939:10-940:7.) Dr. Prowse also conceded that he did not perform any independent analysis of the
27 industry "buckets." (*Id.* at 949:7-10.)

28

TPL also offered no evidence to support its damages rate of 0.125% for HTC. This rate is a dramatic increase over prior license rates that comparable parties actually paid. Dr. Prowse did not use sound analytics to support this rate at trial, and admitted that "there wasn't a formula for coming up with .125 percent." (Trial Tr. 936:7-8.)

The hypothetical negotiation applied in litigation assumes that the patent is valid and infringed. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed."). Dr. Prowse used this legal fiction to inflate HTC's royalty rate to almost 40 or more times higher than the rate HTC's direct competitors in the relevant mobile communications segment paid. Dr. Prowse, however, presented no evidence that would support the specific increase in a royalty rate that TPL now seeks from HTC.

Dr. Prowse instead relied on TPL's asking rates from parties – rates that **nobody** ever accepted – to support a "multiplier" based on the assumption of validity and infringement. TPL presented no evidence to the jury that HTC is the exception. First, Dr. Prowse assigned each of TPL's prior licenses to one of six different licensing "tiers." (Trial Tr. 860:5-8, 863:24-864:10.). Dr. Prowse stated that "it was TPL's policy to attempt to receive higher royalty rates for companies that signed on in higher tiers, or later tiers." (Trial Tr. 860, 13-15.) The tiered structure, according to Dr. Prowse, "indicated . . . that as more and more licensees signed on, there was less risk for them," (Trial Tr. 862, 17-20), and "the patents became more valuable . . . ." (9/26/13, 863, 3-8.) Yet, Dr. Prowse admitted that "they weren't the actual rates received from the licensees . . . ." (9/26, 862, 13-16.) Further, the actual rates received for the relevant industry segment licenses did not follow this structure. (*See generally*, 969:3-974:13.)

Next, each of these "tiers" was assigned its corresponding "tier multiplier." Tier 1, for example, received the highest multiplier of 8.69. (9/26, 876:13-18 ("So what I did was I multiplied that rate by the sought for tier multiplier that represented the difference between tier 1 sought for rates and tier 6 sought for rates, 8.69 . . . .")). This "tier multiplier," as Dr. Prowse explained, was intended to adjust the royalty rate for each TPL license to the level it would have

been had it been negotiated without uncertainty regarding validity and infringement. (*See generally*, 876:13-23.)

Dr. Prowse then multiplied the royalty rate for each license by its corresponding "multiplier" to derive an "effective rate." (935:16-19.) It was this dramatically inflated "calculated effective royalty rate," and not the actual royalty rate derived from the amount paid by the licensee, that Dr. Prowse used as the basis for determining the reasonable royalty for HTC. (*See generally*, 935:16-936:8.) But Dr. Prowse's "tier multiplier" methodology is unsupported by substantial evidence.

To begin with, it was TPL – not Dr. Prowse – who made the decision as to which "tier" would be assigned to each licensee. Further, there are numerous other flaws with Dr. Prowse's tier multiplier calculation. For example, for Tier 1, Dr. Prowse obtained his "8.69" multiplier through a ratio between (1) the average royalty rates that TPL sought from companies in Tier 1 and (2) the average royalty rates it sought from companies in Tier 6. (937:2-12) The problem with this analysis, however, is that it is based on the royalty rates that TPL sought from licensees in these tiers – in other words, the amount TPL was hoping it would obtain, but did not. (*See generally*, 960:9-963:21.) Indeed, Dr. Prowse admitted that the only Tier 6 company, LG, did not actually agree to a license, and that the value he used in calculating his tier multiplier was only a "sought for rate." (960:9-22.) Considering that LG never actually took out a license, TPL's use of this rate to dramatically increase HTC's damages amount was egregious. Because TPL's damages claim is based on these sought for rates, the fact that no licensees accepted these sought-for rates cannot support TPL's damages opinion.

Dr. Prowse also claimed, without sufficient basis, that several prior licensees were given "discounts" for various reasons. (9/26: 883:3-8 ("[W]e've also talked about a second difference between the hypothetical negotiation and the actual licenses that TPL entered into, and that is a lot of the licenses that TPL entered into, they gave discounts for a variety of reasons . . . .")) Yet, Dr. Prowse admits that he has not quantified those discounts. (883:11-13.) Moreover, Dr. Prowse claimed that prior licensees received a discount for ease of negotiating. Yet, TPL's Dan Leckrone admitted that TPL had been in communication for about a year before litigation was

initiated.  On the contrary, the prior licensees that TPL said received discounts for being cooperative ended up taking a license, in some cases, after more than two or three years of negotiations.  Dr. Prowse's testimony established no rational nexus between the evidence pertaining to the "tiers" and the dramatic increase in the royalty rate that resulted from them.

Consequently, because neither TPL nor Dr. Prowse presented legally sufficient evidence to the jury that its royalty base and royalty rates were appropriate, granting HTC's motion for judgment as a matter of law against TPL's damages claim is warranted.

## V.  CONCLUSION

For the foregoing reasons, HTC respectfully requests that the Court grant judgment as a matter of law under Rule 50(a) before this case is submitted to the jury.  In the event the Court denies or declines to rule on this motion, and any issue is found in favor of TPL, HTC reserves its right to bring a renewed motion for judgment as a matter of law in accordance with Federal Rule of Civil Procedure 50(b).

Dated:  September 30, 2013

Respectfully submitted,

COOLEY LLP
HEIDI L. KEEFE
MARK R. WEINSTEIN
RONALD S. LEMIEUX
STEPHEN R. SMITH
KYLE D. CHEN

By: */s/ Mark R. Weinstein*

Attorneys for HTC CORPORATION and HTC AMERICA, INC.