COOLEY LLP
HEIDI L. KEEFE (SBN 178960) (hkeefe@cooley.com)
MARK R. WEINSTEIN (SBN 193043) (mweinstein@cooley.com)
RONALD S. LEMIEUX (SBN 120822) (rlemieux@cooley.com)
KYLE D. CHEN (SBN 239501) (kyle.chen@cooley.com)
Five Palo Alto Square, 4th Floor
3000 El Camino Real
Palo Alto, California 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 857-0663

STEPHEN R. SMITH (*pro hac vice*) (stephen.smith@cooley.com)
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8100

Attorneys for Plaintiffs
HTC CORPORATION and
HTC AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

HTC CORPORATION and HTC AMERICA, INC.,

Plaintiffs,

v.

TECHNOLOGY PROPERTIES LIMITED, PATRIOT SCIENTIFIC CORPORATION, and ALLIACENSE LIMITED,

Defendants.

Case No. 5:08-CV-00882 PSG

(Related to Case No. 5:08-CV-00877 PSG)

**RENEWED MOTION FOR ENTRY OF JUDGMENT AS A MATTER OF LAW OF NON-INFRINGEMENT [PER FED. R. CIV. P. 50(b)]**

Complaint Filed: February 8, 2008
Trial Date: September 23, 2013

Date: December 10, 2013
Time: 10:00 a.m.
Place: Courtroom 5, 4th Floor
Judge: Hon. Paul S. Grewal

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 50(b), Plaintiffs HTC Corporation and HTC America, Inc. (collectively "HTC") hereby renew their motion for judgment as a matter of law ("Motion"), for which the hearing is proposed to be held on December 10, 2013 at 10:00 a.m.

In this Motion, HTC seeks the entry of judgment as a matter of law on the ground that HTC does not infringe any of claims 6, 7, 9, 13, 14 or 15 of U.S. Patent No. 5,809,336 ("'336 patent"). This Motion is based on the Memorandum of Points and Authorities set forth below, the evidence and proceedings at trial, and such other matters as may be presented and allowed by the Court.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

HTC is entitled to judgment as a matter of law because, based on the evidentiary record at trial and the Court's claim construction, no reasonable jury could have found that HTC infringes any asserted claim of the '336 patent. Prior to trial, HTC sought summary judgment that none of the accused HTC products infringe the '336 patent. In ruling on the motion, the Court found that the "entire oscillator" term excluded the use of any external clock to generate the signal used to clock the CPU. (Dkt. No. 585 at 11:1-2; Dkt. No. 616, at 2:4-7) "Nevertheless," the Court held, "there remains a factual dispute whether HTC's products contain an on-chip ring oscillator that is self-generating and does not rely on an input control to determine its frequency." (*Id.* at 11:2-4.) The Court found that the summary judgment record presented "a classic factual question that requires a trial to answer." (*Id.* at 11:6-7.)

This "classic factual question," however, evaporated at trial. The trial record, including testimony elicited from TPL's technical expert, established without question that in all accused HTC products, an "external clock" is "used to generate the signal used to clock the CPU" –

---

[1] Before the case was submitted to the jury, HTC brought a pre-verdict motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on October 1, 2013. (*See* Dkt. No. 647.) This renewed motion is timely filed pursuant to Federal Rule of Civil Procedure 50(b).

precisely what this Court found was excluded from the scope of the asserted claims. In particular, TPL conceded repeatedly at trial that all of the accused HTC products included an on-chip oscillator that relied on an input control to determine its frequency. Judgment as a matter of law, therefore, should be entered in HTC's favor.

**I. <u>LEGAL STANDARD</u>**

TPL's infringement claim against HTC at trial was based solely on literal infringement. (Declaration of Kyle D. Chen in Support of Renewed Motion for Entry of Judgment as a Matter of Law of Non-Infringement ("Chen Decl."), Ex. 1 (09/27/2013 Trial Tr. (Dkt. No. 643)) at 1012:25-1013:8.) Literal infringement could be found only if TPL established that "every limitation recited in the claim appears in the accused device, *i.e.*, when the properly construed claim reads on the accused device exactly." *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001) (internal quotations and citation omitted). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

In deciding a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, a district court must draw all reasonable inferences in favor of the nonmoving party and refrain from making credibility determinations or weighing the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Judgment as a matter of law should be entered because, based on the undisputed evidence presented at trial, no reasonable jury could have found that HTC literally infringes any claim of the '336 patent.

The question of literal infringement in this case did not turn on resolving conflicting evidence or weighing credibility of witnesses – the relevant facts surrounding the operation of the accused products were undisputed. Infringement instead turned on applying the undisputed operation of the accused products to the claim language as construed by the Court. The Federal Circuit has made it clear that in this situation – where there is no material dispute regarding the operation of the accused products – the question of literal infringement is properly decided as a matter of law. *See, e.g., MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007) ("Because there is no dispute regarding the operation of the accused systems, that issue [of literal

infringement] reduces to a question of claim interpretation and is amenable to summary judgment."); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999) ("Because the relevant aspects of the accused device's structure and operation are undisputed in this case, the question of whether [the accused product] literally infringes the asserted claims of the [patent-in-suit] turns on the interpretation of those claims."); *see also Reeves*, 530 U.S. at 150 ("And the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

## II. JMOL OF NON-INFRINGEMENT SHOULD BE GRANTED TO HTC

### A. No Reasonable Jury Could Find that HTC's Products Satisfy the "Entire Oscillator" Limitation

The Court found that the term "entire oscillator" is properly understood to exclude the use of any external clock to generate the signal used to clock the CPU. (*See* Dkt. Nos. 585 at 11 and 616 at 2:4-7.) Based on this construction, the Court explained that the factual dispute for trial was "whether HTC's products contain an on-chip ring oscillator that is self-generating ***and does not rely on an input control to determine its frequency***." (Dkt. No. 585 at 11:3-4 (emphasis added).) The Court's identification of the relevant issue was consistent with the intrinsic record:

- "[T]he Magar microprocessor clock is frequency controlled by a crystal which is also external to the microprocessor. … The Magar microprocessor in no way contemplates a variable speed clock as claimed." (Dkt. No. 457-13, 7/7/1997 Amendment at 3-4 (TPL853_00002427-28).)
- "The Magar teaching is well known in the art as a conventional crystal controlled oscillator. It is specifically distinguished from the instant case in that it is both fixed-frequency (being crystal based) and requires an external crystal or external frequency generator." (Dkt. No. 457-14, 2/10/1998 Amendment at 5 (TPL853_00002403).)
- "Even if the examiner is correct that the variable clock in Sheets is in the same integrated circuit as the microprocessor of system 100, that still does not give the claimed subject matter. In Sheets, a command input is required to change the clock speed." (Dkt. No. 457-17, 1/13/1997 Amendment at 4) (TPL853_00002449).)

The testimony of TPL's technical expert, Dr. Vojin Oklobdzija, confirmed that in all accused HTC products, an "external clock" is "used to generate the signal used to clock the

CPU," precisely what the Court found (and the intrinsic record made clear) was excluded by the claim scope. In particular, the on-chip oscillator in the HTC products "rel[ies] on an input control to determine its frequency." (Dkt. Nos. 585 at 11:2-4 and 616 at 2:6-7.) Dr. Oklobdzija's testimony on this issue was consistent with the testimony of every other technical fact and expert witness that testified at trial.

As Dr. Oklobdzija acknowledged, although each accused HTC product includes either a Qualcomm, Texas Instruments (TI) or Samsung chip, for purposes of his infringement analysis, "they generally work the same way." (Chen Decl., Ex. 2 (09/26/2013 Trial Tr. (Dkt. No. 642)) at 734:16-18.) In particular, each chip includes a Phase Locked Loop (PLL) that receives input from an external (off-chip) reference signal which is based on a crystal. (*Id*. at 734:19-22, 735:6-19, 744:15-745:3.) This external reference signal is, according to Dr. Oklobdzija, "essential" to the PLLs in all of the accused HTC products. (*Id*. at 737:17-738:2.) The external reference produces a "stable" signal that "is **used** to adjust the frequency generated by the ring oscillator, so it has some relationship with it." (*Id*. at 738:9-17 (emphasis added).) The purpose of the PLL, in fact, is to adjust the frequency of the on-chip oscillator based on that external reference. (*Id*. at 746:11-18; *see also* Chen Decl., Ex. 3 (9/25/2013 Trial Tr. (Dkt. No. 641)) at 553:16-554:11.) The evidence at trial confirmed that all of the Qualcomm, TI and Samsung chips at issue in this case use such a PLL with an external reference signal. (*See, e.g*., Chen Decl., Ex. 4 (Trial Ex. 3084) at HTCTP0075742 (TCXO); Ex. 5 (Trial Ex. 3107) at QCHTCTPL0013601 (Fig. 12-1, TCXO), QCHTCTPL0013600; Ex. 6 (Trial Ex. 3109) at QCHTCTPL0017373; Ex. 7 (Trial Ex. 3112) at QCHTCTPL0024020; Ex. 8 (Trial Ex. 3091) at HTCTPI0002154 (CLKTCXO); Ex. 9 (Trial Ex. 3115) at TI-0001073 (CK_REF); Ex. 10 (Trial Ex. 3100) at PIC00004245-46 (XTlpll or EXTCLK.)

Dr. Oklobdzjia also acknowledged that the signal used to clock the CPU is determined by a formula contained "in every textbook" that defines the relationship between the frequency of the reference signal and the output frequency of the on-chip oscillator. (Chen Decl., Ex. 2 (09/26/2013 Trial Tr.) at 739:12-24, 749:4-6, 735:2-5.) The Qualcomm, TI and Samsung chips all use such a formula to determine the frequency of the signal used to clock the CPU. The

notation used to express this formula may differ from chip to chip, but in each case, the formula expressly relies on the external clock frequency as the input control to determine the frequency of the accused oscillator. (*See, e.g.*, Chen Decl., Ex. 11 (Trial Ex. 3101) at QCHTCTPL0007812; Ex. 7 (Trial Ex. 3112) at QCHTCTPL0024021; Ex. 9 (Trial Ex. 3115) at TI-0001076; Ex. 12 (Trial Ex. 3117) at TI-0007192; Ex. 10 (Trial Ex. 3100) at PIC00004247.) One example of such a formula (for a Qualcomm chip) was discussed during Dr. Oklobdzija's cross-examination:

**5.1 Output Frequencies**

The PLL output clock frequency is given by:

$f_{CLK} = f_{TCXO} * L * 2$

(Chen Decl., Ex. 13 (Trial Ex. 3027) at QTPL-0013892.)

The formula shown above states that the output frequency of the on-chip clock ($f_{CLK}$) equals the frequency of the external crystal clock ($f_{TCXO}$), multiplied by "L," multiplied by 2. (Chen Decl., Ex. 2 (09/26/2013 Trial Tr.) at 743:5-20.) The table below, from the same page of Exhibit 3027, shows that the output clock signal frequency of the PLL is based on the external reference frequency (19.2 MHz) multiplied by "L" and 2. For example, for an "L" value of 10, the output of the on-chip clock will equal 19.2 MHz * 2 * 10, which equals 384 MHz. (*Id.* at 743:21-744:17, 748:22-749:6.)

**Table 5-1 PLL output clock frequencies with 19.2 MHz reference**

| Input frequency | L | PLL_L_VAL[5:0] | Output frequency ( MHz) |
|---|---|---|---|
| 19.2 MHz | 10 | 001010 | 384.0 |
| 19.2 MHz | 11 | 001011 | 422.4 |
| 19.2 MHz | 12 | 001100 | 460.8 |
| 19.2 MHz | 13 | 001101 | 499.2 |
| 19.2 MHz | 14 | 001110 | 537.6 |

(Chen Decl., Ex. 13 (Trial Ex. 3027) at QTPL-0013892.) Dr. Oklobdzija admitted that a

manufacturer can select the "L" value depending on what it wanted to achieve in its product. (Chen Decl., Ex. 2 (09/26/2013 Trial Tr.) at 746:8-18.)

As this example illustrates, the external clock in the accused HTC products is indisputably "used to generate the signal used to clock the CPU." This is because the frequency of the on-chip oscillator (represented by the output frequency $f_{clk}$) is determined based on the external clock input (represented, for example, by the input frequency or TCXO above) in accordance with a precise mathematical formula. In this regard, the on-chip oscillator relies on an input control to determine its frequency. The "external clock," simply put, is "used" to generate the signal used to clock the CPU because the external clock determines the frequency of that clock signal.[2]

The trial record is undisputed that all of the PLLs in all of the HTC accused products use a formula, similar to the one above, in which the signal used to clock the CPU has a frequency determined as a function of the frequency of the external clock. This was confirmed through the undisputed trial testimony of Sina Dena, Baher Haroun and Thomas Gafford. (*E.g.*, Chen Decl., Ex. 14 (9/24/2013 Trial Tr. (Dkt. No. 640)) at 350:7-17, 364:22-366:1, 360:21-361:6; Ex. 1 (9/27/2013 Trial Tr.) at 1046:9-14.)

TPL did not dispute that all accused HTC products include an external clock that controls the frequency of the on-chip oscillator. TPL conceded as much in closing argument, asserting that the external crystal is "used to limit or regulate the speed of the clock signal that is generated by the ring oscillator." (Chen Decl., Ex. 15 (10/1/2013 Trial Tr. (Dkt. No. 666)) at 1551:16-18.) TPL's concession eliminated the "factual dispute" that the Court identified as requiring a trial when it denied HTC's motion for summary judgment. (Dkt. No. 585 at 11:2-4.)

TPL's argument at trial focused on the suggestion that, for a system to be excluded from the "entire oscillator" definition, the signal from the external clock had to ***directly*** clock the

---

[2] Indeed, the Office of Unfair Import Investigations for the U.S. International Trade Commission reached the same conclusion in responding to TPL's Petition for Review of the ITC's Initial Determination of no infringement by HTC of the '336 Patent. *See* Request For Judicial Notice filed herewith, Exhibit A at pp.6-15.

CPU. In closing argument, for example, TPL argued that that the on-chip oscillator could be analogized to a sports car following an RV on the road – both vehicles having their own separate engines. TPL's counsel asked the rhetorical question: "But is the RV and the engine in that motor home, is that used to generate the clock signal, or the engine power for the sports car?" (10/1/2013 Trial Tr. at 1552:18-20.) His response: "No way. No way. The sports car has its own engine, generates its own power." (*Id.* at 1552:20-21.)

But the language of the Court's construction, as well as the Court's reasoning, did not support counsel's inapposite analogy. The signal used to clock the CPU in each of the accused HTC products is undisputedly output by a PLL. That PLL output signal in every accused HTC product is defined by a precise formula that always includes the frequency of the signal generated by the external crystal clock. The Court's claim construction of the "entire oscillator" term makes it clear that no external clock can be **used** in any way "to generate the signal used to clock the CPU." The exclusion adopted by the Court does not require the external clock itself to directly generate the signal that actually clocks the CPU – all that is needed is for the external clock to be **used**. The "entire oscillator" limitation cannot be satisfied if an external clock is **used** in any way to generate the signal used to clock the CPU – which is indisputably the situation for all accused HTC products.

This case confirms the Federal Circuit's observation that in cases involving alleged literal infringement, such as this one, the literal infringement question ultimately reduces to a legal question of claim interpretation when the operation of the accused products is undisputed. *See MyMail*, *supra*, 476 F.3d at 1378. The only "disputes" resolved by the jury involved the meaning of the Court's exclusionary language and what it meant to "generate" a clock signal. The jury obviously struggled with these legal issues as evidenced by the two notes it sent out during its deliberations. (*See* Dkt. 656, at 15 (jury question asking for "court's definition of 'generate'"); *id.* at 16 (jury question asking for definition of "other parts" in Court's instruction regarding legal affect of "comprising").) While it is unclear how the jury ultimately came to its finding of literal infringement, the lack of any material dispute in the trial record makes it clear that it did not do so by resolving evidentiary conflicts or making credibility determinations.

Because the operation of the accused HTC products was undisputed, and that operation cannot as a matter of law meet the "entire oscillator" limitation required by all asserted claims, HTC is entitled to judgment as a matter of law of non-infringement.

### B. No Reasonable Jury Could Have Found that the Processing Frequency of the CPU and the "Entire Oscillator" Vary as a Function of the Fabrication or Operational Parameter Variation as Required by the Claims

Based on the undisputed evidence presented at trial, no reasonable jury could have found that the accused HTC products meet the element of "varying the processing frequency of said first plurality of electronic devices [for the CPU] and the clock rate of said second plurality of electronic devices [for the "entire oscillator"] in the same way as a function of parameter variation in one or more fabrication or operational parameters associated with said integrated circuit substrate." The evidence at trial established that the accused HTC products use fixed speed clocks that do not vary as a function of the variation in any of the fabrication or operational parameters. As Mr. Dena testified, for example, "[r]egarding PLL's, I can tell you that PLL's are designed to maintain the target frequency across PVT variations." (*See* Chen Decl., Ex. 1 (9/27/2013 Trial Tr.) at 1062:2-3; *see also* Ex. 14 (9/24/2013 Trial Tr.) at 359:2-8 (Haroun).) Using a fixed speed clock to clock the CPU was important to enable the HTC phones to operate consistently across all conditions. (Chen Decl., Ex. 1 (09/27/2013 Trial Tr.) at 1031:9-1032:9.)

As explained in the previous section, based on the formulae that establish the PLL's output signal frequency, the processing frequency of the CPU and the on-chip clock are a function of the fixed external reference signal and other factors relating to the PLL circuitry. None of the formulae for any Qualcomm, TI or Samsung chip recites any fabrication or operational parameter variation as playing any role in the determination of the PLL output frequency. The accused HTC products, therefore, do not meet the "varying" limitations as a matter of law.

## III. CONCLUSION

For the foregoing reasons, HTC respectfully requests that the Court enter judgment as a matter of law under Rule 50(b) in favor of HTC.

Dated: October 31, 2013

Respectfully submitted,

COOLEY LLP
HEIDI L. KEEFE
MARK R. WEINSTEIN
RONALD S. LEMIEUX
STEPHEN R. SMITH
KYLE D. CHEN

By: *\/s/ Kyle D. Chen*

Attorneys for HTC CORPORATION and HTC AMERICA, INC.

1184434/HN